IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | | |
|---|---|---|---|
| RITA L. MARKER, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No. | |
| | ) | 13-6079-CV-SJ-REL-SSA | |
| CAROLYN W. COLVIN, Acting | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rita Marker seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title II of the Social

Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to indicate what

weight he gave to the opinions of Dr. Bopp, Dr. Idiculla, Dr. Adams, and Mr. Bein; (2) failing

to assess a disabling mental limitation; and (3) failing to assess limitations based on plaintiff's

hand tremors. Plaintiff argues that after her surgery in 2006, she suffered from disabling

memory loss and a tendency to hit and shove people, all due to a lack of oxygen during her

surgery. She argues that she drops things due to hand tremors which also appeared after her

surgery.

I find that the substantial evidence in the record as a whole supports the ALJ's finding

that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be

denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On March 17, 2009, plaintiff applied for disability benefits alleging that she had been

disabled since November 1, 2006. Plaintiff's disability stems from tremors in both hands, pain

in her left arm, poor sleep, poor breathing, poor memory, and "spots on the brain." Plaintiff's

application was denied on September 8, 2009. On November 18, 2010, and August 18, 2011,

hearings were held before an Administrative Law Judge.  On November 10, 2011, the ALJ

found that plaintiff was not under a "disability" as defined in the Act.  On May 20, 2013, the

Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands

as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner.  The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v.

Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the

Commissioner's decision is supported by substantial evidence requires review of the entire

record, considering the evidence in support of and in opposition to the Commissioner's

decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."

Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities &

Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

However, the substantial evidence standard presupposes a zone of choice within which the

decision makers can go either way, without interference by the courts.  "[A]n administrative

2

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

   Yes = not disabled.
   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

   No = not disabled.
   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

   Yes = disabled.
   No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, Timothy Marker, vocational expert Denise Waddell, and medical expert Rick Adams, Ph.D., in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1978 through 2010, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1978 | $ 895.02 | $3,504.69 |
| 1979 | 945.40 | 3,404.17 |
| 1980 | 0.00 | 0.00 |
| 1981 | 1,416.16 | 4,250.09 |
| 1982 | 0.00 | 0.00 |
| 1983 | 0.00 | 0.00 |
| 1984 | 744.49 | 1,907.24 |
| 1985 | 3,317.53 | 8,151.58 |
| 1986 | 7,955.24 | 18,983.55 |
| 1987 | 8,914.54 | 19,997.40 |
| 1988 | 9,065.22 | 19,380.87 |
| 1989 | 10,259.13 | 21,098.03 |
| 1990 | 11,603.61 | 22,809.37 |
| 1991 | 6,743.8 | 12,780.27 |
| 1992 | 1,218.15 | 2,195.39 |
| 1993 | 13,648.65 | 24,388.30 |
| 1994 | 10,122.73 | 17,615.18 |

| | | |
|---|---|---|
| 1995 | 8,172.04 | 13,672.62 |
| 1996 | 12,143.70 | 19,370.28 |
| 1997 | 13,318.81 | 20,073.38 |
| 1998 | 13,818.47 | 19,790.63 |
| 1999 | 15,320.03 | 20,782.94 |
| 2000 | 17,538.36 | 22,545.53 |
| 2001 | 17,928.38 | 22,509.90 |
| 2002 | 18,176.90 | 22,595.32 |
| 2003 | 18,613.99 | 22,586.52 |
| 2004 | 16,958.22 | 19,663.28 |
| 2005 | 18,378.71 | 20,558.13 |
| 2006 | 15,790.55 | 16,886.88 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |

(Tr. at 182-189).

**Disability Report**

In a Disability Report plaintiff reported that she cannot work due to tremors in her hands, pain in her left arm and shoulder, an inability to sleep well, her throat feeling like it is collapsing, memory problems, and having "spots on the brain" (Tr. at 193). She denied an inability to follow written instructions, a need to lie down or prop her feet up during the day, or sleeping too much. She reported, "I have a hard time wearing clothes due to the scarring from the surgery."

**Disability Report - Field Office**

On April 23, 2009, J. Moutry met face to face with plaintiff and observed that plaintiff had no difficulty reading, breathing, understanding, concentrating, talking, answering, coherency, sitting, standing, walking, or writing (Tr. at 202). She was noted to be "very nice."

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated May 25, 2009, plaintiff reported that she plays video games, does puzzles, or uses a computer for 30 minutes to an hour at a time

(Tr. at 219-221). She is currently able to drive (Tr. at 220). She was asked if she needed any help completing the form and she checked, "No" -- the form is handwritten.

**Function Report**

In a Function Report dated May 24, 2009 (Tr. at 222-229), plaintiff described her day as follows:

> Go to bathroom, get dressed, eat sandwich, do some housework, check weather online, watch movie, eat dinner, shower when friend gets home, make popcorn, take pills, go to bathroom then go to bed. These are not done on a daily basis. Do them about every 2 to 3 days.

Plaintiff reported that she only sleeps "3-5 hours in a 24 hour period." (Tr. at 223). This is inconsistent with her administrative hearing testimony when she stated that she sleeps 12 to 16 hours each day.

Plaintiff indicated that she does not need any special reminders to take care of personal needs and grooming or to take her medicine. This contradicts the hearing testimony of her live-in ex-husband who said he had to remind her to take her medicine.

Plaintiff indicated that she prepares her own meals daily for 15 to 20 minutes at a time. This contradicts her hearing testimony when she said she is unable to prepare meals.

Plaintiff is able to do laundry and some cleaning. She does laundry for three hours once a week and she cleans for two hours every 2 to 3 days.

She goes outside every day either walking or riding in a car. She is able to go out alone. She doesn't drive because she doesn't have a car right now. She is able to shop in stores for groceries twice a week for two hours. She is able to pay bills, handle a savings account, use a checkbook, and count change.

Plaintiff talks to people on the phone and she talks to friends using a computer. She takes a daily walk. She does not need anyone to accompany her when she goes out. This contradicts the hearing testimony of her live-in ex-husband who said that plaintiff will not

take a shower unless he is home because she falls. Plaintiff reported that she has no problems getting along with family, friends, neighbors or others (Tr. at 227). She indicated that she has "no problems" getting along with authority figures. This contradicts her hearing testimony when she said she screams at people and shoves them.

When asked to circle the items affected by her condition, plaintiff circled lifting, standing, reaching, walking, memory, concentration, understanding and using her hands. She did not circle sitting, completing tasks, following instructions or getting along with others. When asked how well she follows written instructions, plaintiff wrote, "Good" (Tr. at 227). She has some problems remembering everything when instructions are spoken. Changes in routine "take[] getting used to".

Plaintiff can only reach with her right (dominant) hand and she tries not to use her left hand too much because it falls asleep.

**Function Report - Third Party**

On May 29, 2009, plaintiff's husband[1] completed a Function Report - Third Party (Tr. at 230-237). Mr. Marker reported that plaintiff only sleeps 3 to 4 hours a day. This contradicts her hearing testimony when she said she sleeps 12 to 16 hours per day. He reported that she needs to have someone present when she showers due to losing her balance. However, this contradicts her Function Report when she said she is able to go out daily without anyone accompanying her. It also contradicts Mr. Marker's statement later in this same form when he reported that plaintiff is able to go out alone and that she is capable of driving (Tr. at 233).

---

[1]Plaintiff and her husband were divorced in August 2009; however, they continued living together after their divorce.

He reported that she does not need any reminders to take her medicine. This contradicts his hearing testimony when he said he has to remind her to take her medicine. He reported that she prepares her own meals daily. Plaintiff is able to shop in stores for a couple of hours once a week. Plaintiff crochets and plays computer games "daily" and "very well" (Tr. at 234). Before her disability began, she was on the computer 8 to 10 hours a day. She walks to the park every day and is able to go alone.

Mr. Marker indicated that plaintiff has no problems getting along with family, friends, neighbors or others (Tr. at 234, 235). She gets along with authority figures "very well" (Tr. at 235). This contradicts her hearing testimony when she said she screams at people and shoves them.

Mr. Marker reported that plaintiff is able to follow written instructions "good" (Tr. at 235).

Mr. Marker stated that since her surgery, plaintiff "wets herself" while she is sitting around and while she is in bed.

## B.    SUMMARY OF MEDICAL RECORDS

The parties both summarized the relevant medical records in their briefs. However, both apparently misread the dates on some of these records. For example, defendant referred to stent placement as having occurred on November 22, 2006, and a follow-up on stent placement as having occurred on June 15, 2006 -- five months earlier. However, the only stent placement procedure in this record occurred on May 25, 2006. Plaintiff referred to complaints of hand tremors to Dr. Lukens as having occurred on both January 12, 2007, and February 19, 2007; however, the records cited for these appointments are both dated January

11, 2007.[2]

On May 20, 2006, plaintiff went to the emergency room at Heartland Regional Hospital complaining of discoloration in her left small toe (Tr. at 263-264). She was assessed with intermittent claudication (too little blood flow). She was discharged and told to follow up with her primary care physician.

On May 25, 2006, plaintiff went back to the emergency room complaining that the toe was still discolored and was now causing her pain (Tr. at 265-270). Plaintiff reported having been a smoker for approximately 30 years. She had an arteriogram (an imaging test that uses x-rays and a special dye to see inside the arteries) which showed a high grade left common iliac and aortic stenosis (narrowing of the arteries).[3] Plaintiff was treated with stents - small mesh tubes placed in the blood vessels to support the inner wall of the arteries. A few weeks later, on June 15, 2006, Matthew Lukens, M.D., plaintiff's vascular surgeon, released her to return to work with no restrictions (Tr. at 327). He recommended that plaintiff stop smoking, and she said she would try.

November 1, 2006, is plaintiff's alleged onset of disability.

---

[2]The handwritten record is dated January 11, 2007, and the typewritten record is dated January 12, 2007 (Tr. at 321, 325). I assume the appointment occurred on the 11th and the typewritten report was prepared the following day.

[3]

On November 11, 2006, plaintiff went to the emergency room complaining of swelling in her legs, especially when she is on her feet a lot during the day without being able to sit down and rest (Tr. at 309-315). Plaintiff had no other symptoms. She continued to smoke. Chest x-ray was normal, bilateral ultrasound duplex of the arteries and veins in both legs was normal, all blood work was normal, and an EKG was normal (an EKG is a test that checks for problems with the electrical activity of the heart). Circulation in her legs appeared to be satisfactory "at this time." Dr. Dunlap recommended plaintiff wear support hose while she is at work and that she try to get off her feet two or three times a day and prop her feet up for 10 to 15 minutes at a time. He told her to follow up with her primary care physician within two days.

Ten days later, on November 21, 2006, plaintiff underwent an arterial study of both legs (Tr. at 329). An arterial study evaluates the arteries in the legs for plaque build up or narrowing also known as peripheral vascular disease. Plaintiff had moderate ischemia (inadequate blood supply) at rest -- exercise testing was not done.

About a week later, on November 27, 2006, plaintiff saw Dr. Lukens for a following up on her stent placement (Tr. at 326). Plaintiff had discoloration of several toes involving both feet. Plaintiff reported first noticing the discoloration two to three weeks earlier. Dr. Lukens noted that plaintiff continued to smoke and was taking cholesterol-lowering medication. He recommended a repeat arteriogram (an imaging test that uses x-rays and a special dye to see inside the arteries). This was done on December 1, 2006, and the test revealed blockage at the left iliac stent and narrowing at the right iliac stent (see footnote 3).

On December 6, 2006, plaintiff was admitted to Heartland Regional Medical Center for bypass surgery, performed that day (Tr. at 271-304). Plaintiff was noted to be a long-time

smoker.  Plaintiff's surgery went fine and her oxygen saturation[4] level was 94% to 95% until

4:30 p.m. the following day, December 7, 2006.  At that point, even on oxygen with a face

mask, plaintiff's oxygen saturation level dipped to 86% to 87%.  A CT scan of the chest

suggested pneumonia. Annette Smith, M.D., was called in to evaluate plaintiff.  Plaintiff was

sitting upright in her bed, but she was "minimally arouseable," attempted to follow commands,

opened her eyes when her name was called, and appeared to be breathing comfortably with a

BiPAP mask.[5]  Dr. Smith recommended that plaintiff be put on a ventilator[6] and transferred to

the intensive care unit.  Plaintiff remained on the ventilator for several days and was then

weaned off of it.  X-rays of her chest on December 17, 2006, showed improvement with no

pneumonia; x-rays on December 21, 2006, showed that her lungs were clear.  On December

23, 2006, she had an MRI of her brain which showed "small non-specific bilateral white

matter lesions" with no other abnormalities.  She was discharged on December 24, 2006.

> At the time of discharge, she was able to ambulate and seemed pretty much back to
> baseline.  Her mental status did not appear to be completely normal initially.  An MRI
> was obtained which showed no focal strokes or ischemic [muscle damage due to lack of
> oxygen] injury.  There were some white matter changes which were felt by the
> neurologist to be just nothing at this point that needed further evaluation, so we

---

[4]Oxygen is carried in the blood attached to hemoglobin molecules. Oxygen saturation is a measure of how much oxygen the blood is carrying as a percentage of the maximum it could carry.  One hemoglobin molecule can carry a maximum of four molecules of oxygen.  If 100 hemoglobin molecules were carrying 380 oxygen molecules, they would be carrying (380/400) x 100 = 95% of the maximum number of oxygen molecules they could carry and so together would be 95% saturated.  A normal level is 95% or above.

[5]BiPAP refers to bilevel positive airway pressure. A BiPAP machine is a breathing apparatus that helps its user get more air into his lungs.  The BiPAP machine is derived from the continuous positive airway pressure (CPAP) machine used to treat sleep apnea. Unlike a CPAP machine, however, a BiPAP machine uses variable levels of air pressure instead of continuous pressure.

[6] Intubation is the process of inserting a tube, called an endotracheal tube, into the mouth and then into the airway. This is done so that a patient can be placed on a ventilator to assist with breathing.

discharged her to home with a followup plan to see me in the office in 2 weeks. Her staples had been removed prior to discharge.

On January 11, 2007, plaintiff saw Dr. Lukens for a follow up (Tr. at 321, 325).

Plaintiff reported "hand tremors." Dr. Lukens told plaintiff to "stop smoking." He noted that her surgical wounds had "healed very nicely." Her feet ulcers had completely healed, and she was "doing very well from that standpoint."

> Her only real complaint is that she has bilateral hand tremors whenever she tries to do fine motor activity. I am not exactly sure what the etiology of this is. She obviously was intubated for some time and hypoxic,[7] and I do not know if that could be related to this at all. I am going to refer her to Dr. Makos just for her opinion and see what she thinks might be going on here. I suspect we will just be observing this for now.

Dr. Lukens told plaintiff to follow up in six weeks.

On January 22, 2007, plaintiff saw Mignon Makos, M.D., a neurologist (Tr. at 340-342, 413-415). Plaintiff continued to smoke. Plaintiff described dropping bacon into the pan while trying to cook using tongs, and experiencing hand tremors after taking a drink and putting the glass down. She said her left arm will go numb, and that the hand tremors will start on one hand and move to the other. She reported unsteadiness: "Pt says she sometimes has trouble stepping up onto her porch as it feels like her legs could give out any time. No falls, and she says the legs have not given out." She denied blurred vision, headaches, chest pain, shortness of breath, or dizziness. Plaintiff weighed 251 pounds. She denied changes in appetite or sleep pattern.

On exam plaintiff's gait was normal, she was alert and oriented times four, and she was cooperative. Her mental status was normal, her physical exam was normal except that tremors

---

[7]Deficiency in the amount of oxygen reaching body tissues.

were observed on the right hand when the right hand was partially supinated,[8] but no hand tremor on the left. Plaintiff had full range of motion in all joints, and her coordination and gait were normal.

> I did my best to reassure her that I am not aware of such a surgery with postoperative confusion would cause such a tremor. I have given her a list of medication often use[d] to treat such tremors. I can use medication to control it, but in the big picture, it is benign, cosmetic and certainly not as worrisome as the fact that she is a vasculopath still smoking.

On February 19, 2007, plaintiff had a follow up with Dr. Lukens (Tr. at 320, 324). Plaintiff reported pain under her breastbone on the lower right side of her abdomen from the bypass surgery when she sits up -- she rated her pain a 1 out of 10. Dr. Lukens was unable to find anything abnormal. Plaintiff's wounds we well healed. Dr. Lukens told her to follow up in a year.

More than two years later, on March 17, 2009, plaintiff applied for disability benefits.

On May 7, 2009 -- two years and three months after her last medical appointment -- plaintiff saw Kate Davis, an advanced practice registered nurse (Tr. at 346-348). Her chief complaints were "here for pe [physical exam] to become a foster parent" and shoulder pain which had begun three or four days earlier. Plaintiff continued to smoke, and she consumed coffee and tea daily. She reported working full time at Sam's Club; however, plaintiff had no

---

[8]



Supination        Pronation

reported earnings for 2009. The final page of this medical record is missing from the file.[9] Plaintiff does not include this medical visit in her summary of medical records; therefore, I will assume nothing relevant would have been found in that missing page.

On May 14, 2009, plaintiff saw Ms. Davis for a well-woman exam (Tr. at 345-346). Plaintiff reported cramping in her lower legs at night. "She is persuing [sic] a disability claim at this time due to several different issues." Plaintiff denied feeling tired or poorly. Plaintiff weighed 284.3 pounds. She appeared normal, alert, and was oriented to time, place and person.

On August 24, 2009, plaintiff saw Anne Idiculla, M.D., at the request of Disability Determinations (Tr. at 361-372). Plaintiff reported that she was fired from Sam's Club because she had three hospitalizations in one year.

Plaintiff reported pain in her lumbar area after walking a block or two. Her pain was described as a 6 out of 10 and was relieved with sitting. Plaintiff also reported suffering from constipation. Plaintiff was prescribed medication for incontinence but said she was not taking it regularly due to cost, yet she continued to smoke.

> She feels that her memory is the issue, because she says her friend who is living with her now, tells her she does things and she doesn't remember. I could not get even one specific thing that she is referring to for me.
>
> She also said she had tremors, has been seen by neurology and was advised not to do anything about it, that it would get better or she learns to live with it. She also says she has two spots in her brain, even that when she saw the neurologist, she was told that it is not very significant.
>
> She denies any functional issue deficit at this time.
>
> Plaintiff was not taking any medication for pain. She listed a prescription for high cholesterol and one for incontinence.

---

[9]The file includes, at page 348, "page 4 of 12" and at page 349, "page 6 of 12".

14

Divorced, but presently living with another man, in a trailer. She refers to him as a roommate. . . . He works from 4 PM to 4 AM. She does not sleep until he returns. She's always been working by night, by history. At this time she indicates she is able to do her self care, and she does not use any devices for walking. . . . She smokes a pack of cigarettes a day. . . .

. . . [S]he does not bathe unless her roommate is there, because of her fear of falling. She is very unclear as to whether she fell at all. Housekeeping activities, including cooking, shopping is split with her friend. She is the one who does the laundry and she does all the housekeeping as far as vacuuming goes.

Plaintiff had no difficulty with walking and she did not use any devices. She weighed 290 pounds. She had no weakness in her upper extremities and she had full active range of motion in her shoulders, elbows, forearms, wrists, hands, and fingers. She was able to make a fist and she could open her hand well. "She can hold this." Plaintiff's legs were without swelling or discoloration, and she had "well developed muscles" with normal strength and range of motion in both legs. Plaintiff had a normal gait pattern for an obese female and was able to walk without difficulty. Plaintiff was able to walk on her toes, she could squat, she could get on and off the exam table very well, and her station was normal.

From my assessment today, I did not find any problem with her memory. She was able to answer all the questions very well. She was able to follow directions. She cooperated and has an essentially normal muscular skeletal examination and the only positive finding is the scar on her abdomen.

At this time, with regard to work related function, I do not see her having a problem with sitting, standing, walking, lifting, carrying, handling objects. She did hear everything. She speaks well and even though she does not drive, I do not see that as a problem at this time.

Although plaintiff had complained of pain in her back, Dr. Idiculla found no tenderness or muscle spasms, and any reduced range of motion was likely due to her obese abdomen. Dr. Idiculla wrote, "I am not sure if she is motivated to return to the job market. . . . At this time I do believe she can return to the job market, if she is motivated." She encouraged weight loss.

Later that day plaintiff saw Rhea Williams, an advanced practice registered nurse (Tr. at 394-395). Plaintiff said that for the past month her left collarbone had been popping and

causing pain, and she "thinks she is depressed." (Dr. Idiculla had examined plaintiff's shoulders earlier that day and found normal active range of motion and normal strength in her upper extremities, and she found that plaintiff was not limited in her ability to lift.) Plaintiff said that she thought she had bipolar disorder[10] because she had mood swings. She reported feeling tired or poorly with decreasing ability to concentrate and an "absence of motivation." She reported dizziness, anxiety with palpitations, choking or smothering sensations, muscle tension, jitters, depression accompanied by eating more and then eating less, pessimism about the future, brooding about the past, and insomnia. Although plaintiff had just seen a doctor earlier that day, none of these complaints appear in the doctor's ten-page medical record. Although plaintiff told Nurse Williams that the symptoms had been present for a month or two, it is unclear why plaintiff would fail to report them to the doctor who examined her that morning.

On exam, Nurse Williams noted tenderness in plaintiff's upper back although Dr. Idiculla had examined plaintiff earlier that day and noted no tenderness or muscle spasms anywhere in her back.

---

[10]Bipolar disorder -- sometimes called manic-depressive disorder -- is associated with mood swings that range from the lows of depression to the highs of mania. When you become depressed, you may feel sad or hopeless and lose interest or pleasure in most activities. When your mood shifts in the other direction, you may feel euphoric and full of energy. Mood shifts may occur only a few times a year, or as often as several times a day. In some cases, bipolar disorder causes symptoms of depression and mania at the same time. Although bipolar disorder is a disruptive, long-term condition, you can keep your moods in check by following a treatment plan. In most cases, bipolar disorder can be controlled with medications and psychological counseling (psychotherapy).
http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/con-200 27544

Nurse Williams assessed bipolar disorder type 1,[11] the most severe type of bipolar disorder, based on plaintiff's report that she thought she had bipolar disorder, and she assessed disorder of the synovium, tendon and bursa of the clavicle (all parts of the shoulder joint) apparently based on plaintiff's report of tenderness on exam. Nurse Williams did not elaborate on the "disorder" of these shoulder parts. She prescribed Mobic, a non-steroidal anti-inflammatory, and Tegretol, which treats bipolar disorder. Nurse Williams recommended counseling, but plaintiff said she did not want a counselor.

On September 8, 2009, plaintiff's application for disability benefits was denied initially.

On September 16, 2009, plaintiff returned to see Nurse Williams for a two-week follow up on her new medication (Tr. at 393-394). "Pt tried to take too many pills 1 wk ago. Her roommates lock up her meds now and dole [out] as needed. Feels better now. Not as many outbursts. Feels happier." Nurse Williams noted that plaintiff smiled inappropriately. Otherwise her exam was normal. Ms. Williams increased plaintiff's dose of Tegretol (treats bipolar disorder) and again suggested she see a counselor which plaintiff declined. This record also includes a note at the bottom indicating that plaintiff was to continue her current dose of Tegretol "as 100 mg more made her dizzy and unable [to] focus."

On October 28, 2009, plaintiff saw Denise Jennings, a nurse practitioner (Tr. at 391-392). Plaintiff continued to smoke. Her chief complaint is listed as follows: "Pt presents with

---

[11]    Bipolar I disorder:  Mood swings with bipolar I cause significant difficulty in your job, school or relationships. Manic episodes can be severe and dangerous.

Bipolar II disorder: Bipolar II is less severe than bipolar I. You may have an elevated mood, irritability and some changes in your functioning, but generally you can carry on with your normal daily routine. Instead of full-blown mania, you have hypomania -- a less severe form of mania. In bipolar II, periods of depression typically last longer than periods of hypomania.

Cyclothymic disorder: Cyclothymic disorder, also known as cyclothymia, is a mild form of bipolar disorder. With cyclothymia, hypomania and depression can be disruptive, but the highs and lows are not as severe as they are with other types of bipolar disorder.

constipation and not sleeping well. Having tremors. Having trouble with short term memory. Has bipolar disorder. Sees Becky Draper LPN and has appt with psych in Nov. Had suicide attempt, boyfriend[12] stopped her. . . . Pt reports all of her trouble started after her surgery. She reports trouble with tremors and short term memory impairment since then. She has been unable to work. She is not able to ADL's [perform activities of daily living] on most days. Her boyfriend helps her with her medication. She writes most things down that she has to remember." Plaintiff's mood was described as frustrated and unhappy. Plaintiff reported she had seen a neurologist for her tremors and short term memory loss -- nothing further was mentioned in this record about these symptoms. Nurse Jennings discussed dietary changes and water intake and prescribed Lactulose which treats constipation.

On November 20, 2009, plaintiff saw Jose Menendez, M.D., who assessed episodic mood disorders and ordered a psychiatric evaluation (Tr. at 390). There are no other complaints, test results, observations, or findings in this record. Rebecca Draper Stuck, a social worker in Dr. Menendez's office, ordered individual psychiatric therapy; however, no therapy records appear in this file (Tr. at 390).

On November 25, 2009, plaintiff saw Nurse Jennings for an infected toenail (Tr. at 388-389). She mentioned increased muscle pain since increasing her cholesterol medication. "She is still having trouble with her memory. She has applied for disability and plans to reapply for Medicaid." Plaintiff requested a cheaper cholesterol medication. Her cholesterol

---

[12]Although plaintiff alternately referred to this person as her "friend", her "roommate" and her "boyfriend", her former husband is the one who testified at the administrative hearing consistent with these medical records, and both he and plaintiff testified that they continued to live together in September of 2009 despite having gotten divorced in August 2009. Plaintiff told Mr. Bein that she got divorced in either 2009 or 2010 and lived with a boy friend for about a year before moving back in with her ex-husband about a year before her appointment, which would have been February 2010; however, both plaintiff and her ex-husband testified that they were living together in September and November 2009. The relevance to this is obviously plaintiff's credibility.

medication was changed, and an appointment was scheduled for a partial removal of her toenail.

On December 3, 2009, plaintiff saw Raman Seth, M.D., and had her infected toenail removed (Tr. at 387-388). Plaintiff continued to smoke.

On December 16, 2009, Dr. Menendez prescribed one month's worth of Celexa, an anti-depressant (Tr. at 386). It is not clear whether plaintiff was seen on this day. He refilled her Tegretol on January 12, 2010 (Tr. at 386). Again, it is not clear whether he saw plaintiff that day. On January 14, 2010, plaintiff had blood work done (Tr. at 385). Dr. Menendez assessed, "taking high-risk medication" and "bipolar 1 disorder". There are no complaints, observations, test results, or findings included in this record. On February 15, 2010, Dr. Menendez assessed bipolar 1 disorder with no other notations on the record other than his plan for "psychoactive medication management." (Tr. at 385). On February 26, 2010, Dr. Menendez prescribed Abilify, an antidepressant; however, he did not include anything but this prescription in his record and it is not clear whether this new medication replaced a prescription or was an addition (Tr. at 385).

On March 29, 2010, Dr. Menendez assessed bipolar 1 disorder "recent episode manic" when all of the previous assessments had been "recent episode depressed" (Tr. at 384). However, there is no description of symptoms, no observations, no test results, no findings listed. He prescribed Seroquel, an antipsychotic medication, again without indicating whether it was taking the place of any other medication. He provided for no refills of the Seroquel.

On April 6, 2010, plaintiff saw Nurse Williams (Tr. at 383-384). Her chief complaint was, "Bilateral hands are numb for 2 months, left worse than right[13] and [the] more she uses

---

[13]Plaintiff, in her brief, states that she reported a "two month history of bilateral hand numbness which was worse in her dominant right hand." Plaintiff's brief at page 8. However, the record clearly states that her left was worse than her right (Tr. at 383).

them the worse they get." Plaintiff reported having gained 100 pounds since her surgery in 2006; however, on January 22, 2007 -- a month after her surgery -- she weighed 251 pounds and on this visit she weighed 284 pounds. She reported no dizziness. Her mood was noted to be euthymic, which means a normal mood in which the range of emotions is neither depressed nor highly elevated. Her blood pressure was 140/80 and she was prescribed hydrochlorothiazide (HCTZ) 25 mg, a diuretic. Plaintiff was told to stop smoking, she was counseled about a proper diet and diet pertaining to obesity, and "the patient's goal is to maintain regular exercise."

On April 12, 2010, plaintiff saw Dr. Menendez (Tr. at 382). His only note was an assessment of bipolar 1 disorder, most recent episode manic. His plan was "psychoactive medication management." About an hour and 15 minutes later, plaintiff was seen by Nurse Williams with a report that her blood pressure had been 196/90 at Dr. Menendez's office (Tr. at 381). She was not feeling tired or poorly, she had no dizziness, she had no fainting, no chest pain or discomfort, no shortness of breath, no motor or sensory disturbances. Plaintiff's blood pressure was 162/82. She was assessed with hypertension and high cholesterol. She was prescribed Micardia for high blood pressure and was provided with samples. She was prescribed Tricor for high cholesterol. Plaintiff went in for blood pressure checks on April 15, 2010, and April 20, 2010, but strangely the blood pressure measurements were not recorded, only the fact that her blood pressure was taken (Tr. at 380). Plaintiff had medications refilled in May, June and July 2010 (Tr. at 377-379). Dr. Menendez continued to assess bipolar 1 disorder "most recent episode manic" on May 10, 2010, and June 7, 2010, with no further explanations in his records (Tr. at 379). Two days later, on June 9, 2010, he assessed bipolar 1 disorder "most recent episode depressed" even though the chief complaint was listed as "lab only" and there were no complaints, observations, test results, or findings included in his

record (Tr. at 378). By July 6, 2010, he was back to assessing bipolar 1 disorder "most recent episode manic" with no further notations about anything in this one-sentence record (Tr. at 377).

On July 13, 2010, plaintiff saw Vickie Kimble, a nurse practitioner (Tr. at 376). Plaintiff's blood pressure was 148/90, and she weighed 288 pounds. She was assessed with hypertension and bipolar 1 disorder, most recent episode manic. She was told to stop smoking and she was encouraged to exercise.

On November 18, 2010, plaintiff's first administrative hearing was held.

On December 22, 2010, plaintiff saw Ms. Williams and reported that she had been sleeping 14 to 16 hours a day and was experiencing incontinence during the night or while lying down and coughing (Tr. at 432-434). This had begun about three months earlier. Plaintiff reported having stopped her Seroquel (antipsychotic medication). She continued to smoke. Her blood pressure was 142/74 and she weighed 295 pounds. Her physical exam was normal, her mood was described as euthymic (normal). Despite her report of sleeping more than half the day, her assessment was "bipolar 1 disorder, most recent episode manic." Blood work was ordered. Plaintiff was order to stop using caffeine and to stop smoking. The nurse suggested plaintiff see urology and have a sleep study, but plaintiff declined any testing that was not covered by a sliding fee.

Plaintiff's medications continued to be refilled in January and February 2011 (Tr. at 430, 432).

On February 17, 2011, plaintiff saw Louis Bein, M.S., a consulting psychologist, for a psychological evaluation at the request of the Disability Determinations (Tr. at 416-418). Plaintiff's reports to Mr. Bein are not consistent with her treatment records. For example, she stated that she gets "strange" vision and a "funny feeling" until she closes her eyes. Yet, she

reported dizziness on only one occasion in the past five years and that was in August 2009.  In all other records she denied dizziness, and she never reported this funny feeling or strange vision to any treating doctor or nurse.

Plaintiff reported that she goes crazy and hits and shoves people.  This type of activity was not reflect in any medical record, neither as a complaint nor as an observation.  Her mood was almost consistently described as euthymic, which is normal.  This allegation by plaintiff is also inconsistent with her report of going grocery shopping with her ex-husband and shopping for groceries (with rest periods) for 2 to 2 1/2 hours at a time -- if she were so prone to hitting and shoving people it would seem more likely that her ex-husband would go grocery shopping for her instead of accompanying her for up to 2 1/2 hours at a time especially given her report to Mr. Bein that she only goes out of her home "when she has to."  Mr. Bein's record states that plaintiff's last episode of hitting/shoving was in July 2010 (the ALJ noted that Mr. Bein obviously made a typographical error when he recorded this as July 2011 as that date had not yet arrived).  There are two medical visits in July 2010, and plaintiff did not report to either Dr. Menendez (her psychiatrist) or the nurse she saw on those visits that she had been hitting and shoving people.  If she did, neither felt it significant enough to include it in the medical records.

Plaintiff reported having suicidal thoughts on a daily basis; however, her mental status exams with treating sources were always normal and she did not report feeling suicidal despite being treated by a psychiatrist for the past 15 months.  Plaintiff told Mr. Bein she had overdosed on pills twice about a year earlier.  However, the medical records reflect that plaintiff reported having taken too many pills about a week after her disability claim was initially denied, but by a week later when she went to see a treating nurse, she no longer felt

suicidal, she was much happier, and most importantly she did not seek medical attention at the time she claims she tried to overdose.

Plaintiff told Mr. Bein that sometimes she does not go to sleep until 2:00 a.m. and then does not wake up until around 11:00 a.m. However, she failed to mention that she has always worked at night by choice (she reported this to Dr. Idiculla) and therefore such a sleep routine may not be unusual for her.

Plaintiff told Mr. Bein that she is able to load the dishwasher, and she drove by herself to this appointment (even though her ex-husband accompanied her), both of which require gripping with her hands. Plaintiff reported having been seeing a psychiatrist for the past two years (she began seeing Dr. Menendez 15 months earlier) and a psychotherapist at the same clinic (no psychotherapy records are included in this disability appeal file and plaintiff specifically refused to see a counselor).

Mr. Bein observed that plaintiff's dress and hygiene were adequate. He observed small tremors on occasion. Her eye contact and posture were with normal limits but her gait was unsteady at times. This is inconsistent with her treating records which repeatedly state that her gait was normal.

Plaintiff's speech was hesitant at times. Her mood was anxious. "She did not have any difficulty understanding and remembering this writer's questions or the directions for the examination. Although her thinking was primarily logical and coherent, at times, she was distracted." She was noted to be cooperative and pleasant.

Mr. Bein administered the MMPI-2 and noted that plaintiff's scores indicated an "invalid profile." "Individuals who score in such a way do so because of one of the following reasons: answered randomly, answered all true or all false, or were 'faking bad.' Further, all of the clinical scales (8) were all grossly elevated."

Mr. Bein found that plaintiff "would be expected to understand simple questions/ instructions; however, at times she may have difficulty remembering these." He completed a Medical Source Statement Mental and found that plaintiff had mild difficulty in understanding, remembering and carrying out simple instructions; and moderate difficulty in all of the following: making judgments on simple or complex work-related decisions; understanding, remembering, and carrying out complex instructions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to usual work situations and to changes in a routine work setting.

Plaintiff saw Dr. Menendez on March 11, 2011 (Tr. at 429). Despite having told Mr. Bein three weeks earlier that she was suffering from daily suicidal thoughts, this did not appear in her appointment record with Dr. Menendez, plaintiff's psychiatrist. Her chief complaint was medication refills.

Plaintiff returned to see Ms. Williams on April 27, 2011, for lab work for diabetes (Tr. at 426-427). Plaintiff reported that she was not eating right but could not afford much. "Does eat lots of oranges." She reported blurry vision. Plaintiff was having no change in urinary frequency, no lightheadedness, no weight change. Plaintiff had not been taking her daily aspirin as previously prescribed and she was told to start doing that. She was noted to be noncompliant with her diet, and she had not been checking blood sugar. She did continue to smoke and consume caffeinated coffee and tea daily. She continued to use alcohol socially, and she was not exercising regularly. Her physical and mental exams were normal -- her mood was noted to be euthymic. Plaintiff was told to stop smoking and stop using alcohol. She was told to consume a diabetic and low-fat diet and begin a regular exercise program exercising for 30 minutes per session.

On June 9, 2011, plaintiff signed an acknowledgment of receipt of hearing notice which informed plaintiff that her second administrative hearing was set for August 18, 2011 (Tr. at 156).

Four days later, on June 13, 2011, plaintiff saw Ms. Williams and reported "bad leg cramps" and that her "feet on left foot are turning dark purple" (Tr. at 447). Plaintiff also said she had a knot on the back of her head (Tr. at 447). Plaintiff said that her symptoms had been present for the past three days and were relieved when she elevated her foot. Plaintiff's mood was observed to be euthymic. Plaintiff was assessed with an infected bug bite, calf muscle cramps, and atherosclerosis (narrowing of the arteries) and peripheral vascular disease (the diagnosis before she had the surgery in 2006). An ultrasound was scheduled. The record includes the following notation at the bottom: "Pt may reschedule." Plaintiff was given an antibiotic for the tick bite and told to elevate her foot.

Plaintiff underwent an ultrasound on June 30, 2011, which was normal except for some plaque build-up in her blood vessels (Tr. at 450-451).

On August 18, 2011, second administrative hearing was held during which Dr. Adams testified as a medical expert.

On September 16, 2011, plaintiff saw John Bopp, Ph.D., for memory testing upon request of plaintiff's disability attorney (Tr. at 441-442). Dr. Bopp administered the Wechsler Memory Scale-IV. He noted that plaintiff arrived on time and her hygiene and grooming were good. "She did not have any . . . impaired gross or fine-motor skills." Plaintiff's standard score for visual memory was "below the first percentile which is described as extremely low." Plaintiff's standard score for the index delayed memory was "below the first percentile which is described as extremely low." The standard score for the index immediate memory was in the "third percentile". Her scores indicated "very poor" visual memory, "very poor" delayed

memory" and moderate auditory memory and visual working memory difficulties. "The test scores indicate that Ms. Marker is experiencing significant problems with her memory in all areas as measured by the Wechsler Memory Scale-IV."

On October 4, 2011, plaintiff saw Ms. Williams and complained of swelling and discoloration of her legs if she sat too long (Tr. at 445-446). "She never made an appointment with Dr. Lukens because she didn't have any insurance. Now she has Medicaid." Plaintiff continued to smoke, and she continued to consume caffeinated coffee and tea daily. She continued to drink alcohol "socially." Plaintiff was told she needs to lose weight. Plaintiff weighed 305 pounds.

On October 10, 2011, plaintiff had lab work done (Tr. at 448-449). Her blood sugar was high, A1c was high (A1c is a test to measure the average blood sugar level over the past three months), and her triglycerides (fat in the blood) were high. "Diabetes and lipids are worse." Plaintiff's diabetes and high cholesterol medications were increased and she was told again to cut down on animal fats and follow a diabetic, low-fat diet.

## C.     SUMMARY OF TESTIMONY

During the first hearing held on November 18, 2010, plaintiff and her former husband testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ.

### 1.     Plaintiff's testimony.

Plaintiff was born in 1962 and was 48 years of age at the time of this hearing (Tr. at 51). She has an 11th grade education (Tr. at 51). Plaintiff last worked in November 2006 at Sam's Club driving a forklift and restocking shelves (Tr. at 52). She did that job for a year and a half (Tr. at 52). She left that job when she had surgery (Tr. at 53, 56). Plaintiff worked at Kawasaki for about six months building motors and left that job to go to Sam's Club (Tr. at 53). Plaintiff worked for K-Mart from 2001 to 2004 (Tr. at 53-54). She started out as a cashier

and was promoted to department manager (Tr. at 54). She then spent about a year as a receiving manager unloading trucks (Tr. at 54).

In May 2006 plaintiff had stents put in, and then in November 2006 she had another blockage and had to have bypass surgery (Tr. at 56-57). Plaintiff had not been having any symptoms -- the doctors knew something was wrong because her toe turned black (Tr. at 58). After the surgery plaintiff went into a depression (Tr. at 58). She was having crying spells because of her grandchildren and her mother (Tr. at 58). Plaintiff still gets depressed "sometimes" (Tr. at 58-59). She feels depressed once or twice a week now and stays away from everyone (Tr. at 59).

Plaintiff has been living on a monthly check she gets since her mother passed away (Tr. at 52). She was married until August 2009 when she got divorced (Tr. at 53).

Plaintiff developed problems with her memory after her surgery (Tr. at 59). She can watch movies on television but does not remember what she has seen (Tr. at 59). She started 12th grade but dropped out (Tr. at 59). She can read and write, but when she got her Social Security notices she asked for help reading them because she did not understand what they were saying (Tr. at 60). She has never had any problems reading anything else (Tr. at 60).

Plaintiff used to garden but she no longer has the energy or the desire (Tr. at 61). Plaintiff is taking Tegretol and Celexa for depression and bipolar disorder (Tr. at 62). Since her surgery plaintiff "flies off the handle" and is hard to get along with, but she was not that way before the surgery (Tr. at 62). After her surgery she was no longer outgoing, and she started having screaming fits in her sleep (Tr. at 63). She no longer has screaming fits because her Seroquel dosage was increased (Tr. at 63). That also made her easier to get along with and she no longer has crying spells (Tr. at 64). She still has memory and concentration problems (Tr. at 64). Plaintiff has no side effects from her medication (Tr. at 77).

Plaintiff goes to sleep around 11:00 p.m. (Tr. at 64). She wakes up two or three times at night to use the bathroom (Tr. at 64). She is only awake 5 to 15 minutes each time she gets up (Tr. at 64). She wakes up around 9:00 or 10:00 a.m. (Tr. at 64).

When she gets up, plaintiff eats oatmeal and plays on the computer (Tr. at 65). After about 20 minutes, she gets up to stretch and use the bathroom (Tr. at 65). Plaintiff can sit at a table for about 30 minutes at a time and then she stands up to keep her legs from cramping and to keep her feet from swelling (Tr. at 65). Plaintiff elevates her legs when she lies on the couch -- she does that when she naps or whenever she feels like her legs are beginning to swell (Tr. at 65). Plaintiff takes a nap after her ex-husband leaves for work around 2:00 (Tr. at 66). She takes about a five-hour nap (Tr. at 66). She sleeps for 12 to 16 hours in a 24-hour period (Tr. at 66). She does not remember when she began sleeping that much (Tr. at 66).

Plaintiff can vacuum for 5 or 10 minutes, then her back starts to cramp (Tr. at 67). She elevates her legs then for about 30 minutes (Tr. at 68). She does that so her legs don't swell (Tr. at 68). Her doctors have not told her why her legs swell (Tr. at 68). Plaintiff does not cook much because her back cramps and she cannot stand long enough (Tr. at 68). Plaintiff cannot lift a gallon of milk with her left hand because of numbness (Tr. at 69). That began six or seven months before the hearing (Tr. at 69). First both hands were numb, but then the right hand numbness resolved (Tr. at 69). Plaintiff drops things with her left hand due to numbness, and she drops things with her right dominant hand if she has a tremor (Tr. at 70). Those occur about once a week (Tr. at 70). The tremors began in 2006 after her surgery also (Tr. at 70). Plaintiff's doctors have not told her what causes those (Tr. at 71).

Plaintiff has no problems with cramping when she bends over (Tr. at 71). She does laundry, but she cramps when she loads the washer and pulls the clothes out of the dryer (Tr. at 71). The cramps begin after about 1 or 2 minutes (Tr. at 71). Plaintiff cannot walk very

28

long, but she can walk long enough to shop at Wal-Mart if she leans on things periodically (Tr. at 73). She cannot do all of her shopping without stopping to rest because she cramps (Tr. at 73). She goes into the Subway and sits down for 15 to 20 minutes and then she is able to finish her shopping (Tr. at 73). Plaintiff props her legs up when she sits in the Subway restaurant (Tr. at 74).

Plaintiff suffers from ringing in the ears due to high blood pressure (Tr. at 74). She gets dizzy for 15 to 20 seconds when she stands up (Tr. at 74-75). Plaintiff does not take any medicine for high blood pressure (Tr. at 75). She stopped taking it about 8 months before the hearing (Tr. at 75). The dizziness has gotten worse since then, but plaintiff has not told her doctor about that because she does not have a vehicle (Tr. at 75). However, she testified that she sees a nurse practitioner "whenever something's wrong" and that could be as frequently as once a month, and she sees Dr. Menendez (at a different location) once a month (Tr. at 76). She saw Dr. Menendez the month of the hearing (Tr. at 76).

Plaintiff moved back in with her ex-husband in December 2009 (Tr. at 74). Plaintiff's ex-husband works at the prison in Cameron from 2:00 p.m until midnight (Tr. at 74).

2.    **Testimony of Timothy Marker.**

After plaintiff's surgery in December 2006, she was unable to work with her hands, she was unable to lift anything because of her back, her attitude got worse, and she started forgetting things (Tr. at 78). Mr. Marker has to remind plaintiff to take her medication, plaintiff asks him what day of the week it is so she gets the right pills out of her pill box, and she leaves for the store forgetting to turn off the oven (Tr. at 78). Once or twice a week she will forget where she put something around the house (Tr. at 79). Plaintiff cannot sit for longer than about an hour to watch a movie (Tr. at 78). Plaintiff's hands shake and she will drop something like a glass of tea (Tr. at 79). Plaintiff does not take a shower or bath unless

Mr. Marker is home because she has fallen several times (Tr. at 79). Her legs gave out causing her to fall (Tr. at 79). She has fallen in the shower and in the house (Tr. at 79).

When Mr. Marker goes shopping with plaintiff, they sometimes have to sit down in the eatery for about a half an hour so she can rest and then they continue shopping (Tr. at 80). Plaintiff needs to rest because her legs give out and her back hurts (Tr. at 80).

Plaintiff has some difficulty bending over; she has problems picking up a 12-pack or 24-pack of soda (Tr. at 80). Once a night she will sit on the couch and prop up her legs (Tr. at 80).

Plaintiff has had no crying spells in the past five months, but before her doctor put her on medicine she would cry once or twice a day (Tr. at 81). Before her surgery, she would get really angry if someone teased her, but since her surgery she just laughs it off (Tr. at 81). The surgery improved her temper (Tr. at 81).

3.    **Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes forklift operator, medium, semiskilled, SVP 3; assembly line worker, light, unskilled, SVP 2; store laborer, medium, unskilled, SVP 2 (Tr. at 82).

The first hypothetical involved a person who could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk 6 hours per day; sit 6 hours per day; can only occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs; and should avoid climbing ladders, ropes and scaffolds (Tr. at 82-83). The person could perform plaintiff's past relevant work as an assembly line worker (Tr. at 83). The person could also perform work as a collator operator, DOT 208.685-010, with 1,100 jobs in Missouri and 29,000 in the country; electrical assembler, DOT 729.684-054, with 2,400 jobs in Missouri

30

and 55,000 in the country; or a bench assembler, DOT 706.684-042, with 2,500 jobs in Missouri and 100,500 in the country (Tr. at 83). All of those jobs are light exertional level (Tr. at 83). The hypothetical person could also perform the following sedentary jobs: printed circuit board inspector, DOT 726.684-110, with 1,800 jobs in Missouri and 56,000 in the country; lens inserter, DOT 713.687-026, with 500 in Missouri and 20,000 in the country; and wire wrapper, DOT 723, 687-010, with 500 in Missouri and 34,000 in the country (Tr. at 83-84). These jobs do not require more than the ability to follow simple instructions (Tr. at 85).

The second hypothetical was the same as the first except the person would have to alternate sitting and standing every 30 minutes -- the person could still perform all of the sedentary jobs listed above (Tr. at 84).

If the person had only occasional use of her hands, none of the above jobs could be performed (Tr. at 84).

If the person had to elevate her legs at least two hours a day, none of the jobs could be performed (Tr. at 84).

If the person had to nap for 2 hours during the workday, none of the jobs could be performed (Tr. at 84-85).

If the person would be unable to stay on task for 30% of the day, she could not do any of those jobs (Tr. at 85).

If the person were limited to lifting no more than 10 pounds, the person could still perform the sedentary jobs (Tr. at 85). If the person could have no more than minimal contact with the public or coworkers, the person could still perform all of the jobs listed in the first hypothetical (Tr. at 85).

During the second hearing on August 18, 2011, vocational expert Ms. Waddell testified, and Rick Adams, Ph.D., a medical expert testified.

## 1.    Medical expert testimony.

Medical expert Rick Adams, Ph.D., testified at the request of the Administrative Law Judge.  Dr. Adams reviewed plaintiff's medical records and testified that she has reported a history of mood problems and difficulties with depression (Tr. at 32).  The Savannah Clinic diagnosed her with bipolar disorder, but there is no indication of what symptoms led to that diagnosis (Tr. at 32).  She had a psychological evaluation on February 17, 2011, and reported bipolar disorder and anxiety (Tr. at 32-33).  The examiner found that she had some difficulties with distractability but she performed reasonably well on mental status exam tasks related to concentration and memory (Tr. at 33).  Being able to recall 3 out of 4 objects after 30 minutes is a measure of short-term memory and is within normal limits and not suggestive of significant impairment (Tr. at 33, 36).  The examiner found that plaintiff may have difficulty remembering simple instructions, and if he based it on the short-term memory testing it would be an unsupported conclusion (Tr. at 36, 42).  Plaintiff performed adequately on the other memory and concentration tests (Tr. at 36).  Most clinicians would not consider this result to indicate significant impairment -- they may differ on whether they call it normal or mildly impaired, but it would not be considered significant (Tr. at 43).

Plaintiff reported that she  would sometimes go, "literally crazy and hit or shove people;" however, in all of her medical records she is described as pleasant and with  no major problems interacting with others (Tr. at 33).

Dr. Adams found that plaintiff has minimal to no impairments in activities of daily living (Tr. at 34).  She has moderate difficulty in concentration, persistence and pace (Tr. at

34). She can carry out "simpler" instructions (Tr. at 34). She has only mild impairment socially (Tr. at 34). She has had no episodes of decompensation (Tr. at 34).

Dr. Adams considered Listing 12.04 due to her diagnosis of anxiety; she does not meet that listing (Tr. at 34-35).

Because plaintiff's medical records do not show manic or hypo-manic episodes, the diagnosis of bipolar disorder has not been met (Tr. at 35). The records also do not establish a basis for diagnosing a major depressive episode (Tr. at 35). The medical records may support a diagnosis of dysthymic disorder or depressive disorder not otherwise specified (Tr. at 35).

Dr. Adams would limit plaintiff to simple, repetitive tasks (Tr. at 36). Because she has trouble with depression and stress, he would limit her to a job that does not involve an extremely high-stress environment (Tr. at 37). Psychologically plaintiff is capable of sustaining full-time employment (Tr. at 37). "[The examiner] rated her as having mild difficulty understanding and remembering simple instructions. So he thought that she may have some mild difficulty with that. She may indeed have some mild difficulty with that again for the reasons I mentioned earlier. I think that she can actually technically remember those things but there, there may be some distractability from her emotional problems that would cause some impairment I didn't think greater than mild." (Tr. at 38). As far as Mr. Bein's finding that plaintiff would have difficulty adapting to changes in her environment, Dr. Adams found that routine work would be preferable for her (Tr. at 39). Mr. Bein assessed a GAF of 48, but he did not indicate why (Tr. at 39). It could have been due to her allegation of chronic suicidal thoughts rather than social or occupational limitations (Tr. at 39). GAF assessments are more meaningful if the person articulates how he arrived at it (Tr. at 41). Based on the objective evidence in the medical records, Dr. Adams would assess a GAF higher than 48 (Tr. at

41). Suicidal ideation alone will put someone in a lower number even if other areas of functioning might be higher (Tr. at 41).

Based on plaintiff's records she presents as being able to interact with others normally (Tr. at 40). If she finds people to be stressful and has episodes of hitting and shoving people, that might be problematic (Tr. at 40).

## 2.    Vocational expert testimony.

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge.

Building on the hypotheticals posed during the first hearing, the ALJ asked whether, if the person were able to work under routine, ordinary stress, he could perform the six jobs discussed during the first hearing (Tr. at 45). The vocational expert testified that all of those jobs could be performed (Tr. at 45). The hypothetical person could perform plaintiff's past relevant work as a store laborer (Tr. at 45).

If the person could not follow written instructions, he could not work as an electrical assembler or a bench assembler (Tr. at 46). The person could, however, work as a collator operator, printed circuit board inspector, lens inserter, or wire wrapper (Tr. at 46). If the person could follow only simple written instructions, he could work as an electrical assembler and bench assembler (Tr. at 47).

If a person had serious problems with  memory, concentration, following instructions, and being able to work consistently on a day-to-day basis, the person could not do any of those jobs (Tr. at 47).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Jack McCarthy entered his opinion on November 10, 2011 (Tr. at 17-24). Plaintiff's last insured date was December 31, 2011 (Tr. at 19).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date, November 1, 2006 (Tr. at 19).

Step two.  Plaintiff suffers from the following severe impairments:  obesity, weight-related back pain, peripheral vascular disease status post aortic-iliac bypass with resolution of symptoms, and dysthymic disorder not otherwise specified (Tr. at 19).  Plaintiff's diagnosis of essential tremors does not constitute a severe impairment (Tr. at 19).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19-21).

Step four.  Plaintiff's subjective allegations of disabling symptoms are not entirely credible (Tr. at 21-22).  Plaintiff retains the residual functional capacity to perform light work -- she can lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk six hours per day; sit for six hours per day; occasionally stoop, kneel, crouch, crawl, balance and climb ramps and stairs; should avoid climbing ladders, ropes and scaffolding; is able to follow simple instructions; is able to work under routine ordinary stress; and can only have limited contact with the public and co-workers (Tr. at 21).  With this residual functional capacity plaintiff is unable to perform any past relevant work (Tr. at 23).

Step five.  Plaintiff is capable of performing the job duties of an electrical assembler, collator operator, bench assembler, printed circuit board inspector, lens inserter, and wire wrapper, all of which are available in significant numbers (Tr. at 23-24).  Therefore, plaintiff is not disabled.

## VI.     WEIGHT TO MEDICAL OPINIONS

Plaintiff argues that the ALJ erred in failing to articulate what weight, if any, was given to the opinion of Dr. Bopp, Dr. Idiculla, Dr. Adams, and Mr. Bein.  None of them are treating sources.

Although the ALJ must evaluate all medical opinions in the record, he is not required to articulate in detail what weight is given to the opinion of a non-treating physician. 20 C.F.R. § 404.1527(c). It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001); Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).

Here, the ALJ pointed out that conflicts existed. He pointed out that Dr. Adams saw a diagnosis of bipolar disorder without any basis in any of the records for such a diagnosis (and I note here that the initial diagnosis came from a nurse who made that diagnosis after plaintiff said, "I think I am bipolar."). He discussed Dr. Adams's expert testimony in explaining the tests administered by other medical professionals and the results of those tests in light of all of the observations made in plaintiff's other medical records.

Dr. Bopp

Plaintiff points out that her test scores when meeting with Dr. Bopp after her administrative hearings "reveals that [she] has significant problems with her memory in all areas measured". Significantly, Dr. Bopp noted that plaintiff had "no" problem with fine motor skills -- interesting because plaintiff's fine motor skills were not being tested that day and she apparently was not focused on that alleged impairment at the time. Plaintiff went through 12th grade and although she didn't graduate it was because she lacked one credit. She was not in special education. She was able to drive herself to appointments. She was able to stay at home by herself while her husband was at work. She was able to answer questions about her symptoms, her medical history, her personal history, her medication, etc., and no difficulty with any of these things (or any mental or intellectual ability) was ever noted by any nurse, doctor, or psychologist in more than six years of medical records. Yet when plaintiff was tested by Dr. Bopp in connection with her disability case, she tested in the less than first

36

percentile in almost every category. There is no credibility to these test results, especially in light of the "faking bad" findings by another professional who tested plaintiff in connection with her disability case.

Dr. Idiculla

Plaintiff points out that "although Dr. Idiculla did not notice any memory deficits during Ms. Marker's examination, she questioned whether Ms. Marker should undergo formal psychological and memory testing to rule out whether a mental health impairment was limiting her ability to work." Dr. Idiculla's report includes the following:

> She feels that her memory is the issue, because she says her friend who is living with her now, tells her she does things and she doesn't remember. I could not get even one specific thing that she is referring to for me. . . .
>
> From my assessment today, I did not find any problem with her memory. She was able to answer all the questions very well. She was able to follow directions. She cooperated and has an essentially normal muscular skeletal examination and the only positive finding is the scar on her abdomen. . . .
>
> I am not sure if she is motivated to return to the job market. . . . At this time I do believe she can return to the job market, if she is motivated. . . . If needed a formal psychological and memory assessment can be done.

Dr. Idiculla did not question whether plaintiff should undergo formal psychological and memory testing, she simply stated that those tests could be done if needed given plaintiff's complaint of memory being "the issue" why she can't work. Dr. Idiculla found no basis for that complaint.

Dr. Adams

Plaintiff points out the Dr. Adams, a medical expert witness, testified that if additional information needed to be developed regarding plaintiff's intelligence range, a WAIS-4 would be the appropriate instrument, but a Wechsler Memory Scale would be more comprehensive. Dr. Adams did not testify that he thought those tests were necessary. He reviewed all of plaintiff's records and even gave her the benefit of the doubt (for example, he assumed her

claim of hitting and shoving people was credible despite the fact that nothing but pleasant cooperative behavior was ever observed by anyone) and still found her mental limitations mild.

Mr. Bein

Plaintiff points out that Mr. Bein observed that plaintiff was distracted and the tempo of her thoughts was below average, she was only able to remember one item after 30 minutes, and he thought plaintiff may be functioning at the high end of borderline intelligence. As detailed above, plaintiff's reports to Mr. Bein were markedly inconsistent with her treating medical records. Plaintiff's scores on the MMPI-2 administered by Mr. Bein indicated an "invalid profile." Mr. Bein noted, "Individuals who score in such a way do so because of one of the following reasons: answered randomly, answered all true or all false, or were 'faking bad.' Further, all of the clinical scales (8) were all grossly elevated." And finally, expert witness Dr. Adams testified that there was no basis in Mr. Bein's testing records for finding that plaintiff suffered any greater impairment than that ultimately found by the ALJ.

## VII. *MENTAL LIMITATION AND HAND TREMORS*

Plaintiff argues that the ALJ erred in failing to assess greater limitation in plaintiff's residual functional capacity due to her mental limitation and her hand tremors.

In assessing plaintiff's residual functional capacity, the ALJ is to consider all the evidence of record and is not required to rely entirely on a particular physician's opinion or choose one particular doctor's opinion. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). The ALJ must consider not only medical evidence but all credible evidence of record. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).

There is no credible evidence in the record that plaintiff suffered from any functional limitations due to hand tremors. She and her husband testified that she dropped things; however, this report was not made to treating medical professionals, no medical professional

ever observed any functional limitations as a result of these tremors, the tremors were described by a neurologist as "cosmetic", and Dr. Bopp even noted that plaintiff had no trouble with fine motor skills. Plaintiff's testimony was properly found not credible by the ALJ and plaintiff does not challenge that finding on appeal. The credible evidence in the record as a whole supports the ALJ's finding with regard to plaintiff's limitations due to hand tremors.

Plaintiff's residual functional capacity argument with respect to mental limitations is dependent on the findings of the medical professionals discussed above, and as discussed above, plaintiff's arguments on that basis are without support in the record.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 21, 2014